**Jon T. NEUBAUM and Barbara Neubaum, Appellants,**

v.

**BUCK GLOVE COMPANY, E.L. "Buck" Hord and Kathie Hord, Appellees.**

No. 09–08–00491–CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 17, 2009.

Decided Dec. 31, 2009.

---

David M. Gunn, Erin H. Huber, Beck, Redden & Secrest, LLP, Christopher J. Lowman, The Law Office of Christopher J. Lowman, Houston, Brenton M. Stanfield, Stone & Associates, LLP, The Woodlands, for appellants.

Terry B. Joseph, The Woodlands, for appellees.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

In this usury case, Jon T. Neubaum and Barbara Neubaum appeal a $3,985,804 judgment awarded to Buck Glove Company. In four issues, the Neubaums contend (1) the evidence does not support the finding of usury liability, (2) their cure letter defeated liability, (3) the damages awarded in the judgment are not supported by the evidence, and (4) the award of attorney's fees is not supported by the evidence. We

hold that the jury's finding that the Neubaums loaned money to Buck Glove Company through their agent, Marvin "Buddy" March, is not supported by legally sufficient evidence. Accordingly, we reverse the judgment in favor of Buck Glove Company and render judgment that Buck Glove Company take nothing of its suit against the Neubaums. No party challenged that part of the judgment that awarded $150,578.78 to the Neubaums for money had and received by Buck Glove Company. Accordingly, we affirm that part of the judgment.

The Neubaums own a shopping center. Their office was located in Suite 105. Buddy March purchased an embroidery machine through the Neubaums' son and established a business called Logo Pros in the Neubaums' shopping center in December 2003. In April 2004, March told the Neubaums that he had an order from Disney World for 96,000 screened t-shirts but that he lacked the money to purchase the raw materials to produce the order. The Neubaums advanced March $34,000 in return for a split of March's profits. March came to the Neubaums with orders from more customers and asked the Neubaums to advance money to purchase goods that March would embellish and sell to the customer. The Neubaums purchased a screen printing machine that March used to prepare the products. Barbara Neubaum established an assumed business name called Logo Pros 105 and operated their merchandise transactions with March through a bank account for Logo Pros 105. March and the Neubaums established a course of business in which March would bring a work order from a customer of Logo Pros, Barbara Neubaum would write Logo Pros a check in the amount requested by March for the cost of the goods (customarily 60% of the amount of the customer's order) and March would deposit the check. March would give Neubaum updates on the status of the order, then eventually tell Neubaum that the order had been filled and was ready to invoice. Neubaum would prepare the invoice. The customer would pay March, and March would bring the money to Neubaum.

In January 2005, Buck Hord leased Suite 108 in the Neubaums' shopping center for his business, Buck Glove Company. In April 2005, March began bringing Barbara Neubaum orders from Buck Glove Company. Neubaum would write a check to March's company, Logo Pros, for an amount that was 60% of the purchase order. When March informed Neubaum that all or part of the purchase order had been filled, Neubaum prepared a Logo Pros 105 invoice for the stated amount of the purchase order for the product that March claimed had been delivered to Buck Glove. Hord testified that he saw only one of these invoices, when Barbara Neubaum asked him to give it to March. According to Hord, March supplied Hord information on another report.

In one instance, March brought the Neubaums a communication from Hord's supplier, Seattle Glove, and obtained checks based upon the payment schedule in the communication. That communication was addressed to Logo Pros, not to Buck Glove. The Neubaums gave March the money to purchase the gloves according to the payment schedule. For most of the other transactions at issue in this case, Buck Glove was listed as the purchaser on a purchase order. Usually, the customer would pay March and March would bring the payment to the Neubaums. Buck Glove's checks were written to Logo Pros 105. March and the Neubams would split the difference between the payment and the previously determined "cost of goods."

Not long after Hord moved into Suite 108, March moved from Suite 104 to Suite

107. The spaces were connected by interior doors or by walkways. Hord opened a bank account under the name Logo Pros 108. Either Hord or March would deposit the Logo Pros checks into that account. March had a stamp with Hord's signature that March used to negotiate instruments through Hord's bank account. Hord testified that March "lost" his account and Hord allowed March to use Hord's account. Hord allowed March to operate Hord's finances, apprise Hord of how much money was in Hord's bank account, and inform Hord how much he had to pay. According to Hord, Hord ran the "operations side" and March would "quite often" sign Hord's payroll checks. Hord and March "shared" employees at their shops. According to Hord, March applied logos to gloves using Hord's employees at March's shop.

In mid–2006, March and Hord persuaded a high-school student employed by Logo Pros to open a series of bank accounts in her name, doing business as Olympic Distributors, Buck Glove Distributors, Logo Pros, and Logo Pros 107. The address printed on the checks for the Logo Pros was Suite 108. The accounts were actually for Hord. According to the employee, March controlled all of the bank accounts.

An employee at another shop in the Neubaum's strip center testified that she also engaged in business transactions with March during the same period of time as the Neubaums' transactions. She testified that the investment "was to purchase materials like T-shirts or gloves or something like that for Buddy to—for Logo Pros to—they purchased it with our investment. He then brought in these products and did screen printing or embroidery or something on each of the products and then resold them." March agreed to "repay our investment plus a percentage of the profit."

Another employee of a shop at the Neubaums' strip center testified that she, too, invested more than $70,000 with March between November 2005 and May 2006. According to this witness, she was told that "the money was being used to purchase merchandise for cash discount." March "would purchase the shirts and then they would do like embroidery or screen—silk screens, something like that[.]" In return, "he was to split the profit with us from when he sold the merchandise[.]"

A third witness testified that for a time period of seven or eight months beginning in October 2005, he invested about $250,000 with March. According to this witness, March "would buy T-shirts, one of them like for the Astros, that he was the license to do that with the Astro T-shirts and then he would sell them to like academy or whoever it was. Once he got his money, we would get a portion of the profits back." March never indicated that he was going to loan the money to someone else. March told the witness that March owned Buck Glove, but the witness was not aware at the time that his checks were going into an account for Buck Hord Interest.

Hord was aware that March was not obtaining funds exclusively from the Neubaums. Hord testified, as follows:

Q. Did you become aware at some point that Mr. March was borrowing money from these other people that we just listed?

A. Yes, sir.

Q. Did you discuss that with Mr. March?

A. Yes.

Q. Why was he borrowing money from other people like that? What was those for?

A. Those were to go into the pot so I could continue to pay the Neubaums.

Q. Did you ever repay [them]?

A. Yes. Yes, I did.

Hord's rent check for September 2006 was returned for insufficient funds. On September 14, 2006, Hord, March, and the Neubaums had a contentious meeting. Earlier that morning, March had drafted a promissory note. March also drafted a memorandum addressed from Hord to the Neubaums. Hord signed the memorandum and the promissory note and had the Neubaums sign the promissory note as "lenders." The promissory note is in an original principal amount of $800,000 and bears simple interest at 5% per annum. The note recites that "These loans are for the financing of certain orders received by Buck Glove Company/Logo Pros."

On September 28, 2006, Buck Glove Company sued the Neubaums for usury.[1] The Neubaums sued the Hords for fraud and named March as a responsible third party. The Neubaums also asserted a claim for money had and received.

The case was tried to a jury. The jury found that the Neubaums loaned money to Buck Glove Company for business purposes through their agent, Marvin "Buddy" March. The jury also found that March committed fraud against the Neubaums, but failed to find that either of the Hords or Buck Glove Company committed fraud against the Neubaums.

On appeal, the Neubaums contend there is no evidence that Buddy March had the authority, either actual or apparent, to loan money to Buck Glove Company on behalf of the Neubaums. In determining the legal sufficiency of the evidence supporting the jury's finding, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). We must "consider [the] evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* at 822. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

The existence of authority for an agent to bind a principal is determined by conduct of the principal communicated either to the agent, in the case of actual authority, or a third party, in the case of apparent authority. *Currey v. Lone Star Steel Co.,* 676 S.W.2d 205, 210 (Tex.App.-Fort Worth 1984, no writ). In a recent opinion, the Texarkana Court of Appeals described actual authority of an agent, as follows:

Actual authority, which includes both express and implied authority, generally denotes authority that a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe

---

1. The original petition recited that Buck Glove Company was a corporation. The first amended petition changed the identity of the plaintiff to Buck Hord Interests, Inc. d/b/a Buck Glove Company, a Texas corporation. The petition was later amended to add Ernest L. Hord (referred to collectively with Buck Hord Interests, Inc. as "Buck") and Cathy Hord individually. Only Buck Glove Company recovered a judgment. At trial, Hord testified that Buck Glove Company still exists but he is no longer doing business as Buck Glove Company. Hord also testified that Buck Glove Company is "a DBA" that he owns.

that he possesses, or (3) allows the agent to believe that he possesses by want of due care the authority to act on behalf of the principal. *Suarez v. Jordan,* 35 S.W.3d 268, 273 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex.App.-Houston [1st Dist.] 1994, no writ). Express authority is delegated to an agent by words that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal. *Crooks v. M1 Real Estate Partners, Ltd.,* 238 S.W.3d 474 (Tex.App.-Dallas 2007, pet. denied). Implied authority is the authority to do whatever is reasonably necessary and proper to carry out the agent's express powers. *Spring Garden 79U,* 874 S.W.2d at 948. An agent who does not have express authority does not have implied authority. *Crooks,* 238 S.W.3d at 483 (citing *Sociedad De Solaridad Soc. "El Estillero" v. J.S. McManus Produce Co.,* 964 S.W.2d 332, 334 (Tex. App.-Corpus Christi 1998, no pet.)). This is so because implied authority is authority which is proper, usual, and necessary to the exercise of the authority the principal expressly delegates. *Behring Int'l, Inc. v. Greater Houston Bank,* 662 S.W.2d 642, 649 (Tex.App.-Houston [1st Dist.] 1983, writ dism'd). *Nears v. Holiday Hospitality Franchising, Inc.,* 295 S.W.3d 787, 795 (Tex.App.-Texarkana 2009, no pet. h.).

"Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority." *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 672 (Tex.1998).

"One seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that it purports to exercise." *NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 953 (Tex.1996). "The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner." *Id.* Furthermore, "apparent authority is limited to the scope of responsibility that is apparently authorized." *First Valley Bank of Los Fresnos v. Martin,* 144 S.W.3d 466, 471 (Tex.2004).

Appellees contend the Neubaums authorized March to handle all the details, paperwork, negotiations, and interaction with Buck Glove and argue that March acted exactly as authorized.[2] March admitted he would tell the Neubaums that he had an order, the Neubaums would write a check for the cost of goods of the order, March would purchase the product, deliver it to the customer, and split the profits with the Neubaums. The Neubaums expressly authorized March to buy goods, to embellish the goods purchased, and to sell the embellished goods to customers, including Buck Glove Company. Implied within that express authority were those acts reasonably necessary or proper to carry out those express powers. *See Crooks,* 238 S.W.3d at 483. March testified he never discussed loaning money to Buck Glove with the Neubaums. March was authorized to buy materials and personalize items for sale; making loans to Buck Glove is not reasonably necessary to the performance of the authorized task.

**2.** There was much testimony adduced at trial regarding whether a superseded pleading of the Neubaums' claimed they were in a joint venture with March. No question regarding the existence of a joint venture was submitted to the jury, however, so we do not consider whether the evidence would support liability on that theory. *See* Tex.R. Civ. P. 279.

To support the jury's finding of agency, appellees rely on admissions by both Jon and Barbara Neubaum that they relied upon March to negotiate with Buck Glove. The authorized negotiations concerned sale of merchandise, not loans. Appellees direct the court's attention to Jon Neubaum's testimony that the paperwork was done exactly as he wanted it done, but the Neubaums were presented with documents that appeared to be purchase orders, not promissory notes. Thus, testimony that the paperwork was drawn as intended means only that Neubaum authorized March to fill a purchase order. March also testified that Jon Neubaum told March "I'm just the banker you take care of the rest." This statement suggests that Neubaum, not March, was the "banker" and therefore does not support an inference that Neubaum authorized March to make loans to Hord.

Notwithstanding March's lack of actual authority to make loans to Buck Glove on behalf of the Neubaums, the jury's finding may be upheld if the Neubaums' conduct would lead a reasonably prudent person to believe that March had the authority to make loans on behalf of the Neubaums. Appellees rely on a conversation between Jon Neubaum and Hord. Hord testified as follows:

Q. Okay. Well, did you negotiate the terms of Exhibit No. 1 with Mr. Neubaum or Mrs. Neubaum?

A. No, sir.

Q. Why didn't you go talk to the Neubaums about it if you were borrowing the money from them?

A. After we started, the first couple of transactions I went to Mr. Neubaum, and I said, you know, this feels very awkward, Jon. And he said—so, I said, we'll, you know, we got a lot of money that we're involved with here and I'm just—everything goes through Buddy. And if you want me to be more involved, I just want you to know I'll be happy to get directly involved in it.

Q. Get directly involved how?

A. Well, in the negotiations or how much money we needed or when we needed it or, you know, what my condition was as far as inventory which Jon saw everyday what my condition was because it was pretty evident when he walked in the room.

Q. What did Mr. Neubaum tell you?

A. He said, no, he had done business with Buddy for sometime now. He trusted him, and he wanted to keep it just the way it was.

Q. So, Mr. Neubaum wanted to keep it with Buddy filling out the paperwork and taking the PO to him, right?

A. Do everything through Buddy.

Appellees contend this conversation is significant because it shows that Neubaum communicated to Hord that March had the Neubaums' authority to act on their behalf. Hord was aware that the document being sent to the Neubaums was a purchase order, not a promissory note. Hord knew the purchase orders were not genuine, as he admitted that March never bought any goods that March supposedly sold to Buck Glove in the transactions. Hord authorized March to take the purchase orders to the Neubaums so the Neubaums would give money based on those documents. At the time, the suspicious nature of the transaction did not escape Hord. Asked what happened when the first check was written, Hord replied, "Well, I asked Buddy why are they making them out to Logo Pros when I'm borrowing the money. And Buddy said, that's the way they do it." Hord admitted he never discussed any of the details of any of the alleged loan transactions with the Neubaums. Regarding Hord's conversation with Jon Neubaum,

Hord was asked "Okay. And you never mentioned in that conversation loans; isn't that right? You never mentioned these are loans? You never talked about that specifically; isn't that right?" Hord replied, "To the best of my knowledge, yes, sir." Hord explained that March told him the Neubaums wanted Hord to send the "invoices" describing the goods to them, but when asked if the Neubaums told him to, Hord replied "No." Hord also admitted that the Neubaums never told him that they were loaning him money and never wrote him a check.

Although Jon Neubaum told Hord to deal through March, Hord was aware that March was dealing with others besides the Neubaums and that the Neubaums had not entrusted all of their business to March. Under the circumstances of this case, no person exercising reasonable prudence would presume that instructions to handle purchase orders through an agent communicated that agent's authority to make loans for the principal. Thus, there is no evidence that the Neubaums led Buck Glove to reasonably believe that March had their authority to make loans to Buck Glove.

■ A principal may be held liable for acts of the agent if the principal voluntarily permits the agent to act in an unauthorized manner. *NationsBank, N.A.,* 922 S.W.2d at 953. Although there is evidence in the record from which the jury could infer that the Neubaums were aware that March was holding himself out as their agent in the Buck Glove transactions, the evidence does not support an inference that the Neubaums were aware March was making loans to Hord instead of filling purchase orders. When asked, "Did Buck Hord ever go to the Neubaums at the beginning of these transactions to negotiate terms or conditions of these transactions?" March replied, "I'll tell you what I

do know. That [Hord] met with Jon T. Neubaum in the very beginning and talked about the arrangement for borrowing money from them." Both Hord and Neubaum though, testified that their conversation did not include any discussion of loans. Thus, it cannot reasonably be inferred that the loan from March to Hord was discussed during the conversation between Hord and Neubaum.

The appellees argue that the Neubaums acknowledged the loan by signing the promissory note and memorandum. The promissory note states, in part:

FOR VALUE RECEIVED, Buck Glove Company (hereinafter referred to as the "Borrower"), promises to pay to the order of, Logo Pros 105 (hereinafter referred to as the "Lender") Eight Hundred Thousand dollars ($800,000.00)(the "Loan Amount"). These loans are for the financing of certain orders received by Buck Glove Company/Logo Pros. Logo Pros 105 agrees to loan the money to Buck Glove Company, and Buck Glove Company agrees to pay back to Logo Pros 105 the amount of the loan plus interest set and established in each loan.

1. PAYMENT. The principal amount of this loan shall be paid as loans (referenced above) become due, and are payable to Logo Pros 105 in the form of a cashiers check each Thursday by close of business. Buck Glove will be furnished an aging report from Logo Pros 105 each week and will render payment as is due according to the aging report. Buck Glove Company will have 120 days to make such payments, and any payment over 120 days will be paid by Buck Glove without regard to payment being received from Buck Glove customers.

2. **INTEREST.** The obligation shall bear simple interest which shall be at the rate of Five percent (5%) per annum on any loans that are in default, until that default is cured.

In the memorandum, Hord states that he is making a "proposal" to Logo Pros 105. In the memorandum, Hord states that he allows his customers 120 days before considering them behind on their payments, and that "[w]hen we first began [d]oing these with you, I paid the loans, regardless of [whether] I[h]ad been paid or not [.] . . ." Hord states that,

> I have always paid the receivables to you from the 1–30 columns [o]n your aging report, . . . but they were still at 70 days or less and I continued [t]o pay the loans, much of the time without payment from my customers. I'm asking that you consider letting me pay the receivables from the 1–31 column, this will allow me sufficient time to assure you that payments will be made on time without excuse. Any loan going past 120 days will be paid immediately.

Read in their entirety in the context of the course of dealing between the parties, these documents are not an acknowledgment by the Neubaums that March had made loans to Buck Glove on their behalf. The promissory note is not on its face usurious as it provides for 5% simple interest. The word "loan" is used interchangeably with "receivables" in these documents. The word "loans" is also used in describing the installments on the note. The note says its purpose is to finance orders, not to refinance previous loans. Although these documents are some evidence that the Neubaums acknowledged that Buck Glove would pay interest on an indebtedness, the documents provide no evidence that when they did so, the Neubaums were aware that March had previously loaned money to Buck Glove.

There is no evidence in this record that March possessed either actual or apparent authority to make loans to Buck Glove Company on behalf of the Neubaums. The evidence in the trial record amounts to no more than a scintilla that the Neubaums loaned money to Buck Glove Company through March as their agent. Because there is no evidence supporting the jury's answer to Question One, the trial court erred in awarding a judgment in favor of Buck Glove Company. We sustain issue one. We reverse the judgment in favor of Buck Glove Company and render judgment that Buck Glove Company take nothing of its suit against Jon T. Neubaum and Barbara Neubaum. The award of $150,578.78 to Jon T. Neubaum and Barbara Neubaum for money had and received by Buck Glove Company has not been challenged on appeal. Accordingly, we affirm that part of the judgment.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.